[Civ. No. 114. Fourth Appellate District.—February 11, 1931.]

LINDSAY–STRATHMORE IRRIGATION DISTRICT, Respondent, v. WUTCHUMNA WATER COMPANY, Appellant.

Walter M. Gleason for Appellant.

Sloss & Ackerman, W. G. Irving and Power, McFadzean & Crowe for Respondents.

BARNARD, P. J.—This is an appeal from an order and judgment of the Superior Court of Tulare County in a proceeding brought by the Lindsay-Strathmore Irrigation District, seeking the issuance of a writ of mandate to compel the Wutchumna Water Company to deliver to the petitioner, certain water from the main canal of said water company. It appears that the Kaweah River, shortly after it emerges from the foothills of the Sierra Nevada mountains, divides into two channels at a point known as "McKay Point". Below that point the northerly channel is known as the St. Johns River and the southerly channel is known as the

Kaweah River. Both of these channels run approximately parallel with each other in a general westerly direction, through the county of Tulare. These two channels traverse a large comparatively level delta area, comprising thousands of acres of land, which is known as the Kaweah Delta. The Wutchumna Water Company is a corporation of the type familiarly known as a mutual water company, although it is not strictly such a company, as its water is not appurtenant to any particular land. It was incorporated in 1872, its articles of incorporation beginning as follows: "We, the undersigned, being desirous of forming a corporation for the purpose of Agriculture and Irrigating and the construction and maintaining of ditches or canals to convey water to Visalia and other places in Tulare County, for the purpose of using the water conveyed therein, do hereby certify and declare as follows, viz.:"

The entire outstanding stock of this company is 91 shares, and its principal purpose is to distribute among its stockholders water diverted by it from the Kaweah River, pursuant to two distinct and long-standing rights of appropriation. By the first of these, a considerable portion of the flow of the Kaweah River is diverted into a large canal owned by the company and known as the Wutchumna ditch, which leads out of the northerly bank of the Kaweah River a short distance upstream from McKinley Point. This ditch runs in a westerly direction for several miles to a large storage reservoir, known as Bravo Lake. Upon leaving this reservoir, said ditch flows in a southwesterly direction for about seven miles, when it crosses the St. Johns River and then continues in a westerly direction for approximately ten miles. The lands of the company's stockholders are scattered along the entire course of the ditch and are served by laterals and side ditches from the main canal. A short distance downstream from the point where this ditch crosses the St. Johns River, the company has a second diversion, known as Barton Cut, where water is taken from the St. Johns River and added to the water flowing in the ditch just described. About a mile and a half southwesterly from Bravo Lake and about six miles northeasterly from Barton Cut is a point in the Wutchumna ditch, known as "Lee Drop".

The Lindsay-Strathmore Irrigation District is and since 1915 has been, an irrigation district organized under the

Irrigation District Act of California (Stats. 1897, p. 254) and amendments thereto. The district, which is entirely within the county of Tulare, embraces an area of about 16,000 acres, 9,000 acres thereof being planted to permanent crops, such as "oranges, citrus trees and deciduous fruit", which require irrigation during the irrigating season. Not having sufficient water to irrigate the land already in cultivation, and also for the purposes of securing additional water for the irrigation of lands within its boundaries, in December, 1924, the district made a contract with one H. R. Huebert whereby Huebert agreed to buy shares of the capital stock of certain mutual water companies, including the Wutchumna Ditch Company, and to sell and convey to the district the water and water rights represented by said shares. It was further agreed that until such water and water rights were purchased from Huebert by the district, the district should lease from him the right to use this water at an agreed rental, including the payment of all sums that Huebert should be required to pay as assessments to the several water companies. Pursuant to this agreement, Huebert acquired 18 1/3 shares of stock in the Wutchumna Water Company. The purchase price of these shares was $93,-921.96, and the irrigation district also paid to the water company $12,084.60 in assessments thereon. Since June 1, 1928, 16.33 shares of this stock have been issued in the name of the Lindsay-Strathmore Irrigation District. In order to receive its proportion of the water diverted from the Kaweah River by the water company, the irrigation district, at an expense of $62,000, constructed a pipe-line and conduit from a point near Lee Drop to a tract of land owned by the district, known as the Rancho de Kaweah. While this construction work was under way, the Wutchumna Water Company on October 6, 1928, served upon the district a written notice stating that it was the established policy of the company "that none of its waters shall be diverted for non-riparian uses", and that it was not the intention of the water company to permit the district to divert any water from their ditches for use on nonriparian lands and any efforts to so divert water would be resisted to the utmost. On November 20, 1928, the district served on the water company a written demand that it deliver to the district at the point known as Lee Drop, 16.33/91sts of the water diverted by it from the Kaweah River, and that it construct a suit-

able headgate at the expense of the district for the diversion of such water.

On December 3, 1928, the irrigation district commenced this proceeding, seeking a writ of mandate to enforce its right to receive its proportion of water as a stockholder in the Wutchumna Water Company. Certain lower riparian owners asked permission to intervene in the action, in opposition to the claims of the district, and permission being denied, have taken another appeal, which is now pending. After a trial, judgment was entered declaring the irrigation district to be the owner of 16.33 shares of stock in the water company, and as such stockholder, entitled to receive at Lee Drop, 16.33/91sts of the water flowing in the main canal from time to time. From this judgment, this appeal is taken.

█ *Mandamus* is a proper remedy where a stockholder in such a corporation as the Wutchumna Water Company is improperly denied its proportionate share of water. (*Miller* v. *Imperial Water Co.*, 156 Cal. 27 [24 L. R. A. (N. S.) 372, 103 Pac. 227, 228].) In that case the court said: "We have the case of a member of a corporation who is improperly precluded by the corporation from participating in the only practical right resulting from such membership, that of having water available for the purpose furnished at cost upon his land, in proportion to the amount of stock held by him. He is seeking to enforce a plain right based entirely upon his membership in a mutual water company, deprivation of which right would practically exclude him for the time from all privileges of membership, in a case where, it must be held under the decisions, there is not a plain, speedy, and adequate remedy, in the ordinary course of law. It is one of the well recognized offices of the remedy by *mandamus* to enforce the plain rights of stockholders or members of corporations in the absence of any other adequate remedy. . . . In the case at bar, the stockholder's right to have water furnished on his land is not based on any special contract entered into by him with the corporation, but is an inseparable adjunct of his membership, and it is a plain duty resting on the corporation in the exercise of its corporate functions to furnish him such water."

The right of a stockholder in such a corporation as the appellant is clearly described in the following quotation

from 2 Wiel on Water Rights, third edition, section 1266: "Mutual companies are usually such that shares of stock represent rights to specific quantities of water, and the stockholder's right to a supply rests upon his stock and not upon his status as a member of the public, the company being formed to supply water to its stockholders only."

Such rights are well recognized in California. (*Barton* v. *Riverside Water Co.*, 155 Cal. 509 [23 L. R. A. (N. S.) 331, 101 Pac. 790]; *Thayer* v. *California Dev. Co.*, 164 Cal. 117 [128 Pac. 21].) While such a stockholder's right to water may be made appurtenant to certain lands (Civ. Code, sec. 324), not only is this not essential (*Bank of Visalia* v. *Smith*, 146 Cal. 398 [81 Pac. 542]), but in the instant case, appellant concedes in its brief that the water it is diverting "is not appurtenant to any particular land".

The appellant makes a general argument that for a number of reasons the respondent is not entitled to a writ of mandate, and then more specifically argues that the particular judgment entered in this case is void. It is first contended that the respondent is not a stockholder in the appellant corporation. ▌ On November 2, 1926, the following provision was added to section 31 of article IV of the Constitution of this state: "provided, further, that irrigation districts for the purpose of acquiring water and water rights and other property necessary for their uses and purposes, may acquire and hold the stock of corporations, domestic or foreign, owning waters, water rights, canals, waterworks, franchises or concessions subject to the same obligations and liabilities as are imposed by law upon all other stockholders in such corporation."

Thereafter, the Irrigation District Act (sec. 15) was amended to permit irrigation districts to acquire such stock (Stats. 1927, p. 23). Appellant contends that these amendments do not apply to any irrigation district organized prior thereto, because if they were construed to apply to such prior existing districts, they would be repugnant to section 10, article I, and to section 1 of amendment XIV of the Constitution of the United States, as impairing the obligation of a contract. Reliance is placed upon the case of *Merchants Bank* v. *Escondido Irr. Dist.*, 144 Cal. 329 [77 Pac. 937]. In that case, the court was considering an amendment to section 17 of the Wright Act which attempted to give to the board of directors of an irrigation district,

power to hypothecate all of the property of the district as additional security for bonds to be issued. Because the legal title only of such property is vested in the district and this legal title is held in trust for the land owners, who are the real beneficial owners of the property, it was held that the legislature could not authorize the directors of a district to thus dispose of that property, without impairing the constitutional rights of the land owners. However, in referring to the case just mentioned, the Supreme Court in the later case of *La Mesa etc. Irr. Dist.* v. *Halley,* 197 Cal. 50 [239 Pac. 719, 723], used the following language: ''While the conclusion was, we think, correct as applied to the facts of that particular case, it is being attempted by the respondents herein to give to its language an application far beyond the intendment of the court in that decision. It was not our intention in that case to hold that as to the general powers of irrigation districts or as to methods of their management and conduct or as to the method or manner of issuing bonds for the purpose of carrying on the work of said districts or fulfilling the purposes of their organization, such districts were to be limited or the people or property owners within the same confined to the precise terms of the statutes in force at the time of the organization thereof. Indeed, in later cases, and with respect to public agencies and utilities of the same general character as irrigation districts, the courts of this state have laid down a different rule.''

Appellant contends that the La Mesa case merely distinguishes between public rights and private rights, and that where private rights are involved, any such amendment impairs the obligation of a contract. It is argued that this constitutional provision against impairing the obligation of a contract, had the effect of protecting the land owners in the respondent district from the obligations and liabilities which ownership of stock in such a corporation as the Wutchumna Water Company might impose upon them; and that, therefore, the amendments here in question, if construed to apply to irrigation districts established prior to their enactment, would be void. We are unable to agree with this contention. The amendments we are considering do not affect any vested rights, and go no farther than to enlarge the powers of irrigation districts along the line of one of the most important purposes of such a district, which

is, to secure an adequate supply of water. Not only is the legislature, in enacting amendments or statutes relative to the organization, powers and administration of municipal or other public corporations, exercising powers of government and not making a contract with the individuals embraced within the territory covered by such a corporation (*La Mesa etc. Irr. Dist.* v. *Halley, supra*), ▪ but this particular change in the law affected only the management of an irrigation district and the manner in which it might carry out the purposes for which it was organized. In such matters, an irrigation district is not limited to the law existing at the time the district is organized. The argument that this particular amendment might result in an increased expense to a land owner in the district over that contemplated when the district was formed, is by no means conclusive. It is well settled that an irrigation district has the power to construct an irrigation system, to buy an existing water system, or in various ways to enlarge its system, and to increase its assessments for the purpose of acquiring and operating such additions. More adequate service may well result in increased expense. To permit an irrigation district to acquire increased facilities through the purchase of stock in water companies, the equivalent of purchasing additional water rights or water systems, is no different in principle. ▪

Nor do we find any warrant in the authorities for the proposition that in thus dealing with one of the state's political subdivisions, a statutory amendment enlarging or limiting the powers of such a subdivision, is intended to apply only to subdivisions thereafter created, in the absence of a direct provision to that effect. ▪ A further consideration is that, in any event, no obligation of any contract with the appellant has been impaired, and in the absence of a showing of injury on its part, it may not be heard. (*Hooker* v. *Burr,* 137 Cal. 663 [99 Am. St. Rep. 17, 70 Pac. 778]; *Hooker* v. *Burr,* 194 U. S. 415 [48 L. Ed. 1046, 24 Sup. Ct. Rep. 706, see, also, Rose's U. S. Notes]; *Scheerer & Co.* v. *Deming,* 154 Cal. 138 [97 Pac. 155]. ▪ In this connection, appellant further argues that at the time the original contract was made by the irrigation district with H. R. Huebert, as above referred to, it was illegal for the district to acquire stock in the appellant company; and that this contract was such a fraud upon the land owners in the district that, under the familiar rule that a court

will not issue· a writ of mandate to assist in carrying out an illegal purpose, the writ must be denied. (Citing 38 Cor. Jur. 556; 16 Cal. Jur. 769.) At the time this contract was entered into, section 15 of the Irrigation District Act expressly authorized such a district to acquire water rights by lease (Stats. 1919, p. 661). That portion of this contract was then legal, and that was the only part carried out prior to' the time the law was changed. Conceding that such a writ of mandate as is here prayed for would not have been issued prior to the change in the law, it fully appears that at the time this writ was applied for, the acts sought to be coerced were not forbidden by law, and that they did not tend to aid an unlawful purpose.

■ The appellant next urges that the respondent irrigation district intends to furnish the water claimed to various land owners within the district, and that the district does not itself own or possess the lands on which the water claimed is to be used. It therefore justifies its refusal to furnish water to respondent by a clause in its amended articles of incorporation, which reads as follows: ''No water of this company shall be used on any other land than such as may at the time be owned or possessed by its stockholders, or one or more of them. . . . ''

The articles of incorporation of appellant were amended in February, 1914, by eliminating all reference in the original articles to ''selling'' water, and by adding a provision relative to furnishing water to its stockholders, which included the clause above quoted with a further provision, the whole of this part reading as follows: '' . . . provided, however, that no water of this company shall be used on any other land than such as may at the time be owned or possessed by its stockholders, or one or more of them, and provided further, that this corporation shall not use such water or its property as a public utility company, but solely for the use and benefit of its stockholders for the irrigation of their respective lands, and for watering their stock, domestic uses and other useful purposes for their benefit as a private use.''

It seems clear that these changes were made for the purpose of rendering it less likely that the corporation would be placed under the restrictions of the Public Utilities Act and·subject to the regulation of the Railroad Commission. All of the changes are so worded as to make it clear that

the corporation is merely distributing water to its stockholders, and is not in the business of selling water to the public. Not only is it apparent that this proviso was put into the amended articles for a purpose other than for the strict interpretation attributed to it by the appellant, but the words used, "owned or possessed", should be liberally construed. These words indicate no more than a limiting of the obligation to furnish water to those entitled to it through ownership of stock in the company, rather than an obligation to furnish water to the general public. It would be unreasonable to hold that they apply, in a highly technical sense, to land owned by the party holding the stock, rather than to land owned or possessed by the party who really owns such stock and who is entitled to the rights and benefits represented thereby. If a land owner entitled to a certain proportion of the water distributed by appellant should borrow money, giving a deed of trust upon his land as security therefor, and as further security should transfer his stock in appellant corporation to the trustee, it could hardly be held that he would be no longer entitled to receive the water represented by the stock. The same thing would apply if a minor should happen to own land entitled to such water, but the stock should actually stand in the name of his guardian. As was said by the Supreme Court in the case of *Miller* v. *Imperial Water Co.*, 156 Cal. 27 [24 L. R. A. (N. S.) 372, 103 Pac. 227, 229] : "The terms 'owning', 'owner' 'owned', depend somewhat for their signification upon the connection in which they are used. They are not technical, but general, terms, and are, therefore, liberally construed, 'the precise meaning depending upon the nature of the subject-matter and the connection in which' they are used."

While the legal title to the stock here in question rests in the respondent irrigation district, the beneficial and equitable owners thereof are the land owners within that district, whose funds have purchased the stock. (*Merchants' Bank* v. *Escondido Irr. Dist., supra; Tulare Irr. Dist.* v. *Collins,* 154 Cal. 440 [97 Pac. 1124]; *Hall* v. *Superior Court,* 198 Cal. 373 [245 Pac. 814]; California Irrigation District Act, sec. 29.) In distributing the water to the land owners within its boundaries, the respondent will be applying the water upon lands owned by the real owners of the stock in question. Under these circumstances, we think that

such lands are owned or possessed by the "stockholders" of appellant "or one or more of them", within the meaning of the clause referred to.

Appellant's main contention, in connection with its claim that the respondent is not entitled to any writ of mandate, is that, notwithstanding any stock it may own in the appellant corporation, the respondent is prohibited by a resolution adopted by appellant's board of directors from receiving any of the water claimed, since the respondent intends to put such water to a use prohibited thereby. This resolution was adopted on August 4, 1928, more than two months after the stock in question was issued to respondent by the appellant. This resolution recites that whereas, under the by-laws of the company the board has the right to make rules and regulations governing the use of the water furnished; and whereas, it has been the long established policy of the company that the water it takes from the Kaweah and St. Johns Rivers shall be used only on lands in the Kaweah delta or lands within the watershed of said rivers, it is therefore resolved, that from and after this date, none of the water controlled by the company may or shall be used for any purpose whatever on any land situated outside of the Kaweah delta and not within the watershed of the St. Johns or Kaweah Rivers. It is then further resolved that this rule shall not apply to the use of such water by a stockholder on any land on which such water is now being used, or on which at any time in the past, a present stockholder shall have used said water; and shall apply only to lands which have never been theretofore supplied with such water or on which a present stockholder has not in the past used said water.

Not only is there no evidence in the record to show that the lands within the respondent district are outside of the Kaweah delta and not within the watershed of the St. Johns or Kaweah Rivers, but such evidence would not be conclusive, if it existed. Another phase of the controversy between the parties to this action was before the Supreme Court in the case of *Consolidated Peoples Ditch Co.* v. *Foothill Ditch Co.*, 205 Cal. 54 [269 Pac. 915]. That case refers to shares of stock purchased by this respondent in several corporations, including this appellant, and the court there points out that this appellant is not a corporation organized for the purpose of furnishing water only to a particular

district. The question then arises whether a change to such a purpose was accomplished by this resolution of the board of directors passed on August 4, 1928. It is appellant's theory that this board had authority to pass such a resolution because of the general powers in regard to the management of appellant's business, which was vested in the board by the by-laws of the corporation. The pertinent parts of these by-laws as they had existed for more than twenty years prior to the adoption of this resolution read as follows:

"Article V.—Powers of Directors. The board of Directors shall have power to do all things which this corporation is empowered to do by law and to make all rules and regulations which they deem necessary for the government of this Company, and the use of its waters and ditches not inconsistent with the laws of the State of California; . . . "

"Article VI.—Duties of Directors. It shall be the duty of the Board of Directors . . . to direct and provide means for distribution of waters, and to regulate and control the same and all canals, ditches and headgates belonging to this Company. . . . "

During all of that twenty years, article VII of these by-laws provided for the appointment of a general superintendent and then provided as follows: "It shall be the duty of said superintendent to take charge of and care for all the ditches, canals and structures and headgates of this Company, and to attend to all diversion of waters and the distribution thereof . . . and to turn out into the side ditch or ditches of the respective stockholders such portion of the waters flowing in the main canal of this Company as the number of shares of capital stock owned or leased by such stockholder bears a ratio to the whole number of shares of capital stock issued by this Company, unless otherwise directed by said Board, and to do all things in his power to promote the equitable distribution of the waters flowing through said main canal, among said stockholders."

The resolution of August 4, 1928, attempting to limit the use of water furnished to a certain area, if valid, works a complete change from the purpose for which the corporation was formed. Neither the original articles of incorporation, the amended article, nor the by-laws as they existed for more than twenty years, disclose any such purpose. While the by-laws conferred on the board of directors authority to

make rules and regulations for the government of the company and the use of its waters, this authority is subject to general laws governing corporations, and it was beyond the power of the board to make arbitrary discriminations between different stockholders, or to so change its rules as to take away the beneficial interest of one stockholder by a new regulation which did not affect all other stockholders. While a corporation could have been organized for the purpose expressed in the resolution, as pointed out in *Consolidated Peoples Ditch Co.* v. *Foothill Ditch Co., supra,* this corporation is not one of that kind. Moreover, as shown by the evidence and as indicated in this resolution itself, the practice of the corporation had been to the contrary. The uncontradicted evidence shows that more than one-third of such waters had for many years been used on lands which were not within the watershed named, and the resolution itself provided as follows: "Be it further resolved, that this said rule and regulation shall not apply to or govern the use of waters of this Company by a stockholder of this Company on any land or lands on which waters from the ditches of this Company is now being used in irrigation season, or, on which, at any time in the past, said present stockholders have used said waters, and shall apply only to lands which have never been supplied heretofore by the Wutchumna ditch or ditches or on which a present stockholder of this Company has not in the past used said waters."

Not only is a different previous policy here admitted, but a discrimination is thus made between a stockholder who at some previous time used water in a certain manner, or one now using it that way, and another stockholder, who, relying on the articles of incorporation and the by-laws and conditions as they always have existed, has purchased stock and at great expense made preparation to use the water in the same manner. ■ Not only must by-laws be reasonable (2 Thompson on Corporations, 3d ed., secs. 1099, 1100 and 1103; 14 C. J. 368), but they must also operate equally upon all persons of the same class. (2 Thompson on Corporations, 3d ed., sec. 1104; 14 C. J. 366.) It would appear that the resolution in question was adopted by the board of directors for the sole purpose of excluding this respondent from the enjoyment of the rights represented by the stock already acquired, but whether or not this is true, the resolution is void so far as

it attempts to interfere with the right of respondent to receive the proportion of water to which it was entitled by virtue of its shares of stock in the appellant corporation.

In addition to its various arguments why respondent is not entitled to any writ of mandate, appellant directs its main attack against the judgment that was entered in this case, upon the ground that it is void for uncertainty. The vital portion of this judgment, as set forth by appellant, is as follows: "That said petitioner, Lindsay-Strathmore Irrigation District, as owner of said shares of said capital stock, is entitled to receive of and from said respondents Wutchumna Water Company and James B. Rivers, and to have delivered to it by them . . . into its . . . conduit leading from a point on the main canal of said respondent Wutchumna Water Company known as Lee Drop, situate in Section 2 in Township 18 South, Range 26 East . . . and that said petitioners do have and receive of and from said respondents, from time to time, and that said respondents deliver to said petitioner at said Lee Drop, 16.33 ninety-firsts (16.33/91sts) of all of the water from time to time flowing in the main canal of the said respondent, Wutchumna Water Company."

Appellant relies particularly upon two cases. In *Wallace* v. *Farmers' Ditch Co.*, 130 Cal. 578 [62 Pac. 1078], a case involving a diversion from the Kaweah River, the court held that the judgment was invalid for uncertainty. In effect, the court held that it was impossible to tell from the findings or judgment how much each party was to get, and that no facts had been found which would enable the share of the respective parties to be computed. Also, in the case of *Riverside Water Co.* v. *Sargent,* 112 Cal. 230 [44 Pac. 560], a case involving the rights of two appropriators of water, the court found that the plaintiff was entitled to take all of the water, except what the defendant was entitled to take. And further, that the defendant had theretofore diverted all of the water that a certain ditch would carry, during the irrigation season. Obviously, this was too uncertain and the court held that the lower court had neither fixed the quantity, nor had found facts giving the data from which the quantity could be calculated. Appellant further cites 14 Cal. Jur. 954, as follows: "A judgment or decree must be sufficiently definite and certain that it may be enforced and constitute an estoppel between the parties.

It should contain a definite statement of the rights of the parties or a definite means of ascertaining them.''

After stating this rule, California Jurisprudence continues as follows: ''In a water rights suit involving the rights of several parties, the judgment should fix their respective rights as to quantity, time and manner of use, as definitely as the circumstances and conditions permit.'' Appellant then argues that the requirement of certainty and definiteness is especially necessary in *mandamus* cases, quoting the following from 16 Cal. Jur. 877: ''The judgment, as well as the preliminary demand, should be for specific and certain relief, such as clearly defines the rights of the plaintiff, and distinctly fixes the obligation imposed upon the defendant''.

· In this same paragraph, this authority goes on to set forth the rule that where the duty sought to be compelled is defined by a particular statute, the rights of the petitioner are measured by such statute, and in case the statute specifies that officers shall have some discretion as to the method of carrying out the acts enjoined upon them, the judgment should merely direct the officers to perform the acts in accordance with the provisions of the law, and should not specify in what manner the acts are to be done. We think a similar rule applies in the instant case, and that since the board of directors of appellant had a discretion as to the method and manner of distributing water to the various stockholders of the corporation, the trial court was correct in not specifying the exact manner in which the water to which respondent is entitled should be delivered, but in merely directing that respondent's proper proportion of the water, as represented by its stock in the corporation, should be delivered to it. The court correctly left the details of the manner and method of distribution to the discretion of the directors, which, of necessity, must be exercised by this board, in accordance with the general rules of law.

Section 2 of article VII of appellant's by-laws made it ·the duty of the superintendent ''to turn out into the side ditch or ditches of the respective stockholders, such portion of the water flowing in the main canal of this company as the number of shares of capital stock owned or leased by such stockholders bears a ratio to the whole number of shares of capital stock issued by this company''. The judgment and writ of mandate in this case merely declared

the right of the petitioner in accordance with that provision. The language of the judgment closely corresponds to the language of the by-laws and no reason appears why any more difficulty should be experienced now, in understanding the meaning thereof, than has existed in distributing water in accordance with this provision of the by-laws during the past two years. It will be noted that the portion of the judgment complained of merely orders that the respondent shall receive its proportionate share of the water flowing in the main canal, and specifies it is to be taken out at Lee Drop. This point is on the main canal, and it sufficiently appears that the water to be apportioned is the water that flows by that point. The discretion of the board of directors as to when the water shall be taken from the river, how long it shall be stored in Bravo Lake, and when and in what amount it shall be allowed to flow past Lee Drop, is in no manner interfered with. The judgment is certain and definite as to the particular portion which respondent is entitled to receive, but it is so worded, in providing that respondent shall receive a certain proportion of all the water that from time to time passes this point, that it does not require that it shall receive its proportion continuously, as the water flows past that point, but under the double "time to time" provision it even permits the directors of the corporation, in their discretion, to rotate the water between several stockholders, providing only that respondent receive its just share; although of course this discretion on the part of the board would still be subject to the provisions of article VII of the by-laws and to the general law, which require that any such rotation be conducted on an equitable basis. Appellant argues that the phrase "all the water" might refer to water in the Wutchumna ditch which had not been diverted by the appellant, but which belonged to other parties. Not only is there no evidence of any water in this ditch not diverted by appelalnt, and all of the evidence points to the fact that there is no such other water; but the judgment sufficiently shows that it refers only to the water to which respondent is entitled by virtue of its ownership of shares of stock in the appellant corporation; and therefore, that it applies only to such water as has been diverted by appellant for the purpose of distribution among its stockholders, in accordance with the purpose for which it was organized. The judgment herein, in referring to

"all the water", means exactly what section 2 of by-law VII means in saying that each stockholder shall receive his proportion of "the waters". Appellant argues that the phrase "from time to time" leaves an uncertainty as to whether the water must be delivered continuously at Lee Drop at all times when water is flowing in the ditch, or whether it can be delivered intermittently, in accordance with a system of rotation. As we have already pointed out, the double use of this phrase clearly indicates that the judgment provides that the respondent shall receive its just share of water equitably with other stockholders, but that the details of distribution, particularly the matter of storage and proper rotation, is left to the discretion of the board of directors, which is as it should be.

Appellant also objects to the phrase "flowing in the main canal"; it being contended that the part of appellant's main ditch which is below and receives water from Barton Cut, might also be considered a part of the "main canal", and that the judgment leaves it uncertain whether the proportion of water directed to be delivered to respondent at Lee Drop includes water diverted from the St. Johns River through Barton Cut, or whether it applies only to water taken from the Kaweah River through the first diversion and brought through Bravo Lake. And further, that it is uncertain as to whether or not various possible seepages above and below Lee Drop shall be taken into consideration. Irrespective of whether or not the respondent had an additional right to its proportion of water diverted by the appellant through Barton Cut, which is some miles below Lee Drop, the point where respondent's side ditch approaches appellant's main canal, we think this judgment is sufficiently clear and definite to show that it applies only to the water in appellant's main canal flowing past Lee Drop, and that it only provides that respondent shall receive its proportion of the total amount of water that flows by that point. We know of no rule of law under which respondent could be prohibited from claiming and receiving its rights as a stockholder to water taken under one diversion from a river, by the fact that it might also have additional rights, as a stockholder, to water from another diversion lower down on the same river. Not only is it not to be presumed that the court intended, by this judgment, to provide for an exchange whereby respondent, in lieu of any right it might

have to water from the lower diversion, might take additional water from the upper diversion, but the "main canal" referred to is sufficiently identified by the reference to "Lee Drop". We conclude that the portion of the judgment complained of is sufficiently definite and certain to cover the purpose intended, which is, to secure for respondent that right as a stockholder which it had made preparation to receive, and that it does this without interfering with such details of management as are in the discretion of the board of directors of appellant, and that in an action involving water rights, as suggested by the rule we have quoted from California Jurisprudence, this is as definite as the circumstances and conditions permit.

While appellant raises another point, that the evidence does not support the judgment, its argument thereon goes entirely to suggested ways in which it considers the judgment uncertain, and the views we have expressed render a further consideration of the point unnecessary.

In addition to asserted errors of law which have already been covered in other connections, appellant contends that the refusal of the trial court to permit certain lower riparian owners to file a complaint in intervention in this action constitutes an error of law as against this appellant. The proposed intervention was based upon the claim that such lower owners, who claimed to be riparian to the St. Johns River, were entitled to benefits coming from an increase in the flow of said river caused by seepage from the Wutchumna ditch, below Lee Drop, into the river. It is appellant's theory that the proposed interveners were necessary parties to this action. A separate appeal from the order refusing permission to intervene was submitted with the appeal we are now considering, an opinion in which is being separately filed. If the conclusion we have reached in that appeal, to the effect that permission to intervene was properly denied, is correct, the point here raised is disposed of.

The order and judgment of the trial court are affirmed.

Marks, J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 9, 1931, and a peti-

tion by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 10, 1931.